**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **Tinka Vassileva,** ) | |
| Plaintiff, ) | |
| ) | **Case No: 18 C 4595** |
| v. ) | |
| ) | **Judge Ronald A. Guzmán** |
| **City of Chicago,** ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, Defendant's motion for summary judgment [37] is granted in part and denied in part. Plaintiff's motion for leave to file more than forty additional facts instanter [52] is granted. The parties shall appear for a status hearing on October 23, 2019 at 9:30 a.m. in order to set a trial date.

## STATEMENT

Before setting forth the facts of the case, the Court addresses Defendant's assertions of procedural improprieties. Specifically, Defendant spends most of its reply challenging Plaintiff's statement of additional facts and responses to Defendant's statement of facts, asserting that they misstate or are unsupported by the record, are immaterial or conclusory, or contain inadmissible hearsay. Defendant also seeks to strike Plaintiff's statement of additional facts to the extent that the facts exceed the forty allowed by LR 56.1(b)(3)(C). Some of the objections are well-taken, and certain offending responses or statements of fact by either party have not been taken into account if the Court deems the objection to be misplaced or itself immaterial. With respect to Plaintiff's setting forth more than forty additional facts, the Court does not condone flouting Local Rules without express prior permission from the Court; nevertheless, if an additional statement of fact, whatever its number, is relevant to the inquiry, the Court has considered it. Therefore, Plaintiff's motion for leave to file more than forty additional facts instanter is granted.

**Facts**

Tinka Vassileva, a 54-year-old woman from Bulgaria, is an employee with the City of Chicago Department of Water Management ("DWM"). (Def.'s Stmt. Facts, Dkt. # 39, ¶ 1.) Plaintiff began working for DWM as a Filtration Engineer ("FE") II at the Jardine Water Purification Plant ("JWPP") in July 2001. (*Id.* ¶ 2.) In January 2009, Plaintiff was laid off but was immediately transferred into an equally-rated, vacant FE II position with DWM and continued to work. (*Id.*) On July 16, 2009, Plaintiff was again laid off as the result of City-wide layoffs due to a lack of funds. (*Id.*) The City recalled Plaintiff to her FE II position on May 16, 2011, and she currently remains in that title. (*Id.*)

DWM is divided into five bureaus, one of which is the Bureau of Water Supply ("BWS").
BWS operates two purification plants, the JWPP and the Sawyer Water Purification Plant ("SWPP"), which treat and remove impurities from raw water and transmit clean water to the 12 pumping stations throughout the City. (*Id*. ¶ 5.) JWPP is further divided into four sections: (1) Operations; (2) Mechanical; (3) Chemical Inventory; and (4) Instrumentation. (*Id*. ¶ 6.) Operations is responsible for overseeing the Control Center ("CC") and the chemical laboratory ("Control Lab"); Mechanical is responsible for the maintenance of major equipment, *e.g.*, basins and low-lift pumps; Chemical Inventory is responsible for inspecting chemical tank control devices and completing chemical feed reports; and Instrumentation is responsible for calibrating filter turbidity meters, outlet chlorine residual instruments, and the SCADA system. (*Id*.) Former Managing Deputy Commissioner Alan Stark headed BWS until his retirement in September 2018, and all BWS employees ultimately reported to him. (*Id*. ¶ 7.) Below Stark on the organizational chart were Deputy Commissioner John Pope, Engineer of Water Purification Eduardo Salinas, and the Chief FE, a position that has been vacant as of 2016. (*Id*.)

Yadi Babapour, a 66-year-old male Iranian who is 66 years old, was the FE V in charge of Operations, and Plaintiff's immediate supervisor. (*Id*. ¶ 8.) The FE job series is a technical one. (*Id*. ¶ 9.) The FEs are responsible for taking data generated by the chemists from the Control Lab and making decisions regarding the water purification and treatment process based on the data. (*Id*.) The bulk of such decisions are made in the CC, which operates around the clock and is where monitoring all aspects of the plant and the entire water purification and treatment process occurs. (*Id*. ¶ 10.) The FE III is in charge of the CC and must maintain the reservoir and header water levels at the appropriate amount; maintain required chemical dosages, feeds, and residuals; and monitor the SCADA screen and wall alarm board for any potential problems. (*Id*. ¶ 11.) In comparison, the FE II assists the FE III and does not work unsupervised while in the CC. (*Id*.)[1]

Depending on personnel, the CC has been staffed with either: (1) a FE III and a FE II ("2-person operation) or (2) a FE III ("1-person operation"). (*Id*. ¶ 12.) The CC was a 2-person operation from January 27, 2017 to April 14, 2018 and a 1-person operation from January 1, 2016 to January 26, 2017 and April 15, 2018 to present. (*Id*.) Before each of these staffing changes, the City notified the Union. (*Id*.) In 2016, the City filled several FE IV vacancies, which created a shortage of FE IIIs. (*Id*. ¶ 13.) Therefore, with the Union's agreement, BWS continued to use the newly-filled FE IVs in the CC from January 2016 to January 2017. (*Id*.) Working the CC is not considered to be outside of the FE IV's duties and responsibilities. (*Id*.)[2]

---

[1] Plaintiff asserts that an FE II could act up as an FE III during one-person operations. (Pl.'s Resp. Def.'s Stmt. Facts, Dkt. # 52-1, ¶ 12.)

[2] Plaintiff does not agree with the staffing representations made by Defendant, but the differences do not affect the Court's ruling.

2

The City also used Acting FE IIIs (FE IIs acting up as FE IIIs) in the CC to supplement the shortage of FE IIIs starting around April 2018. (*Id*. ¶ 14.)

According to Defendant, Plaintiff did not adequately perform her FE II duties in the CC and was not well-versed in basic filtration engineering terminology and plant operations, such as knowing how hydraulics work; how to read the SCADA computer feedback; the difference between dislodging versus backwashing; and the difference between concentration versus dosage. (*Id*. ¶ 15.) Defendant contends that Plaintiff frequently made mistakes; repeated the same mistakes even after counseling; and often became argumentative and defensive when counseled by her supervisors. (*Id*.) Because of her attitude, Plaintiff's supervisors found it difficult to train her. (*Id*.) Plaintiff's mistakes in the CC have included:

- Allowing the plant's water level to get too low;
- Failing to properly adjust the plant's chemical feed;
- Making unnecessary chemical changes, causing equipment failure; and
- Neglecting to identify that two EPA-required lab tests (testing the raw water) during her shift were missing.

(*Id*. ¶ 16.) Mistakes in the CC can lead to public health risks if the water is not properly treated; flooding of the plant; and diminishing the public's confidence in the City's water supply. (*Id*. ¶ 17.) Plaintiff disputes Defendant's statements regarding her purported deficiencies.

Overtime and "Acting up." Plaintiff worked overtime on numerous occasions in 2017 and 2018, but contends that she was denied overtime because she was not allowed to act up as an FE III and was therefore excluded from certain overtime opportunities provided to FE IIIs. (*Id*. ¶¶ 21, 22.) "Acting up" is governed by the City's Hire Plan and occurs when an employee is directed to, and does perform, substantially all of the responsibilities of a higher-graded job title within the same class of positions, *i.e.*, a FE II to FE III. (*Id*. ¶ 23.) An employee may only act up into the higher-graded job title if she is deemed eligible to act up; in other words, the employee must have the present ability to perform the duties of the higher-graded title. (*Id*.) Management determines whether an employee is qualified to act up into the higher-graded job title, and an employee who acts up is paid at the salary of the higher-graded job title. (*Id*.) FE IIs become eligible to act up as FE III through on-the-job training, *i.e.*, observing the FE III while working together on shift in the CC, and refresher training. (*Id*. ¶ 24.)

In February 2018, Salinas found Plaintiff ineligible to act up based on the feedback of FE Vs and FE IVs who worked with Plaintiff in the CC, including Babapour, Harold Keaton, Krystyna Reschke, and Jacek Wroblewski. (*Id*. ¶ 26.) According to these individuals, Plaintiff could not perform the duties of a FE III because she lacked basic knowledge about plant operations; could not independently operate the plant and make decisions; frequently made mistakes and repeatedly made the same mistakes; and refused to listen and/or follow their

3

direction. (*Id*. ¶ 27.)[3] The BWS managers (Stark, Pope, and Salinas) all have tried to help Plaintiff improve her performance and have consistently instructed the FE Vs to continue training Plaintiff and provide her with as much training as necessary. (*Id*. ¶ 28.) Plaintiff began acting up in 2019 after demonstrating in December 2018 that she could consistently perform the FE III duties. (*Id*. ¶ 29.) Plaintiff alleges that when she asked Salinas why she could not act up, he told her "a woman like her" could not work in the CC because "she didn't know how to use the computers" and "was too old" and that she needed to "obey her supervisor no matter what." (*Id*. ¶ 30.) Plaintiff alleges that she overheard Stark say Plaintiff was too old to work in the CC and that she thought she could attend any training she wanted (in reference to an Operator C/D class on February 26-27, 2018) because of her culture. (*Id*. ¶ 31.) According to Plaintiff, Babapouri told her that while she had the necessary seniority to act up, she also had to be "suitable," and to stop complaining and "put her head down like other women." (Pl.'s Resp. Def.'s Stmt. Facts, Dkt. # 52, ¶ 32.)

Absence. In January 2017, Plaintiff was docked one day's pay for a November 2, 2016 absence because she did not work or call in her absence that day; thus it was considered unexcused pursuant to DWM attendance policy. (Def.'s Stmt. Facts, Dkt. # 39, ¶¶ 36-37.)

Training. On February 26-27, 2018, DWM hosted the Illinois Section of the American Water Works Association ("ISAWWA") to teach an Operator C/D class at JWPP. The class had limited space and provided credit hours necessary to obtain or renew a Drinking Water Operator Certificate ("Class A license"). (*Id*. ¶ 41.) Babapour, who was in charge of selecting who would attend the training, did not include Plaintiff because she already had her certificate and he believed she already had enough credit hours to renew her certificate. (*Id*. ¶¶ 46-47.) Plaintiff claims that Babapour called her during one of her midnight shifts and asked her when her Class A license expired. (Pl.'s Resp. Def.'s Stmt. Facts, Dkt. # 52-1, ¶ 42.) Plaintiff states she told Babapour it expired in July 2018, so he signed her up for the February 2018 class. (*Id*.) Defendant contends Plaintiff was not on the final lists of registrants for the training. (Def.'s Stmt. Facts, Dkt. # 39, ¶ 47.) Despite not being registered for the training, Plaintiff attempted to attend the Operator C/D class; there were not enough training materials for everyone because the ISAWWA instructor had brought only enough materials for the registered attendees. (*Id*. ¶ 48.) Salinas and Pope asked Plaintiff to leave (according to Plaintiff, in an aggressive manner) because she was not registered. (*Id*. ¶ 49.) Although initially refusing, Plaintiff left the class, and notified Pope that two other individuals had handwritten their names on the registration sheet. (*Id*. ¶ 50.) Those two men were also asked to leave, and they did so without incident. (*Id*.)

Promotion. Plaintiff contends she was wrongfully denied a promotion to FE V in both

---

[3] Again, Plaintiff denies her purported deficiencies.

4

November 2016 and December 2017.[4] On September 13, 2016, the City posted a Bid Announcement announcing one FE V vacancy. Four internal candidates timely submitted applications for the position: Plaintiff; John Ellis (national origin unknown, male, 66); Harold Keaton (American, male, 46); and Krystyna Reschke (Polish, female, 56). (*Id*. ¶ 57.) Department of Human Resources Recruiter Martin Wise reviewed each bidder's application, determined they met the minimum qualifications of the position, and referred them for an interview. (*Id*.) All four candidates were separately interviewed by the same interview panel: Stark, Salinas, and Frank Skiadopoulos (a FE V at SWPP). (*Id*. ¶ 58.) The interview panel asked the same six interview questions to each candidate. (*Id*.) Wise was also present during all the interviews to ensure the interviews complied with the City's hiring policies and procedures. (*Id*.) The interview panelists took notes on each bidder in their respective Candidate Assessment Forms and independently rated the candidates. (*Id*. ¶ 59.)

The candidates were rated on each of their interview question responses (the possible ratings were Clearly Demonstrates Competency; Demonstrates Some of the Competency; or Does Not Demonstrate Competency) and received an overall candidate rating (the possible ratings were Recommend for Hire; Recommend with Some Reservations; or Do Not Recommend for Hire). (*Id*.) The panelists turned in their interview packets to Wise after each candidate's interview. (*Id*.) Plaintiff received ratings of "Does Not Demonstrate the Competency" on each of the six questions from each of the three interviewers except one.[5] (*Id*. ¶ 60.) The interview panelists gave Plaintiff low ratings because she was often off-topic, and her responses showed she lacked experience in plant operations. (*Id*. ¶ 61.) Plaintiff admits none of the interviewers made any comments about her national origin, sex, or age during her interview. (*Id*. ¶ 62.) Plaintiff also admits she does not know how the other candidates performed, what ratings they received, or how the interview panelists treated them because she was not present during their interviews. (*Id*. ¶ 63.) Of the four candidates, two, Mr. Keaton and Ms. Reschke, were recommended as qualified for the FE V position, and because Keaton had seniority, he was offered the position while Ms. Reschke was placed on the pre-qualified candidate ("PQC") list. (*Id*. ¶ 64.) Seniority is not considered until after a candidate(s) is found to be qualified. Other factors, such as job performance, disciplinary history, and other credentials, are not considered when determining whether or not a candidate is qualified – only interview performance is considered. (*Id*. ¶ 66.)

In November 2017, the City had another FE V vacancy. (*Id*. ¶ 67.) The City used the PQL list previously generated in November 2016 rather than post the vacancy. (*Id*.) Since Ms. Reschke remained on the PQC list, she was offered the position in December 2017. (*Id*.)

---

[4] Plaintiff also asserts that she was denied a promotion to FE IV in 2008 and to FE IV in 2015, but admits these denials are untimely with respect to the instant lawsuit. (Pl.'s Resp. Def.'s Stmt. Facts, Dkt. # 52-1, ¶ 52.)

[5] On Question #1, Skiadopoulos rated Plaintiff as demonstrating some of the required competency. (*Id*. ¶ 60.)

5

Retaliation. Plaintiff alleges she was retaliated against for filing charges with the Illinois Department of Human Rights ("IDHR"). (*Id*. ¶ 69.) On February 2, 2017, March 14, 2017, and March 5, 2018, Plaintiff filed three separate IDHR charges, which were cross-filed with the Equal Employment Opportunity Commission ("EEOC"). (*Id*.) In November 2017, the IDHR held a fact-finding conference for these charges, which was attended by Babapour, Stark, and Marisol Santiago, the Managing Deputy Commissioner, on behalf of the City. (*Id*. ¶ 70.) Plaintiff filed the instant case on July 2, 2018. (*Id*. ¶ 71.) Plaintiff alleges that Salinas retaliated against her by "throwing her out" of the training on February 26, 2018 and telling her she was "too old" to work in the CC.[6] (*Id*. ¶ 73.) Plaintiff alleges Stark retaliated against her by periodically assigning her to cover the storeroom to monitor inventory; assigning another FE II to the Instrumentation Section but not Plaintiff; and not properly listening to her interview responses. (*Id*.) Plaintiff alleges Stark and Babapour retaliated against her by not allowing her to act up. (*Id*.) Lastly, Plaintiff alleges the City retaliated against her by not posting the second FE V position that was offered to Ms. Reschke. (*Id*.)

**Standard**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021 (7th Cir. 2018). Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

**Analysis**

Pursuant to the Age Discrimination in Employment Act ("ADEA"), it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), "protects against workplace discrimination on the basis of one's race, color, gender, sex, religion, or national origin." *Erdmann v. Packaging Corp. of Am.*, No. 19 C 905, 2019 WL 3068298, at *1 (E.D. Wis. July 12, 2019). Plaintiff alleges that the City discriminated against her based on her sex, age, and national origin when it did not allow her to act up as an FE III in 2018; did not allow her to attend training on February

---

[6] Salinas and Pope were not aware of Plaintiff's IDHR charges until she filed the instant lawsuit. (*Id*. ¶ 71.)

26, 2018; and failed to promote her to FE V in November 2016 and December 2017. She further alleges that she was discriminated against because of her sex and national origin when she was docked for one day's pay in January 2017.

"[T]he ADEA is narrower than Title VII . . . , as Title VII also protects against mixed-motive discrimination," while age must be the "but-for" cause of discrimination under the ADEA. *Carson v. Lake Cty.*, 865 F.3d 526, 532 (7th Cir. 2017). "A plaintiff may prove . . . discrimination either directly or indirectly, and with a combination of direct and circumstantial evidence." *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017). "The direct method requires the plaintiff to set forth 'sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action.'" *Id*. (internal citation omitted). "The indirect method allows a plaintiff to prove discrimination by using the burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Id*. As summarized by another court:

> A plaintiff supports a discrimination claim [under the *McDonnell Douglas* burden-shifting framework] by presenting evidence that shows: (1) she belongs to a protected class, (2) she met the employer's legitimate performance expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees outside her protected class received more favorable treatment. If the plaintiff makes this showing, then the employer can defeat the claim by articulating a legitimate, non-discriminatory reason for the adverse employment action. The plaintiff then may move forward with her claim only if she can demonstrate that the employer's proffered reason is pretextual – that is, a lie to hide discriminatory conduct.

*Wade v. Ind. Univ. Sch. of Med.*, No. 16 C 2256, 2019 WL 3067519, at *9 (S.D. Ind. July 12, 2019) (internal citations omitted). Whatever the method of proof, the Court must determine "'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race [, sex, age or national origin] . . . caused the [adverse employment action].'" *McKinney*, 866 F.3d at 807 (citation omitted).

Plaintiff contends that certain workplace comments provide a sufficient basis for a jury to find sex, age, and national origin discrimination. She first points to Salinas, who Defendant acknowledges was the decisionmaker with respect to whether Plaintiff would be permitted to act up. According to Plaintiff, when she asked Salinas why she had not been allowed to act up, he said "women like you can't work in Control Center rotation shift. You don't know how to use computers in Control room." (Def.'s Resp. Pl.'s Stmt. Facts. Dkt. # 61, ¶ 25.) Plaintiff also asserts that he told her she was too old to work in CC in the rotation shift. (*Id*.) Further, Babapour, Plaintiff's supervisor, asked Plaintiff why she was complaining and stated she "should put [her] head down and follow like other women." (*Id*. ¶ 26.) Babapour also allegedly referenced Syed Raheem's wife, stating, "Syed's wife never work[ed] so why do you want to work?" and that "[s]ome women just prefer to stay at home." (*Id*.) Plaintiff further testified that

7

when she spoke with him on one occasion about acting up as a FE III, Babapour told her that if she did not like it "here, she could always go back to her country where they don't have unions or any other places to go to complain." (*Id*. ¶ 27.) Finally, Plaintiff asserts that she overheard Stark, the former Managing Deputy Commissioner of BWS, tell another employee that Plaintiff "might have good training but is too old to work in the [CC] and go to all the activities that we['re] doing in the plant." (*Id*. ¶ 28.)

Defendant contends that these purported discriminatory remarks are "belied by the evidence in the record," pointing out that two FE IIs who are older than Plaintiff and one female FE II were all allowed to act up. (Def.'s Reply, Dkt. # 60, at 12.) But these facts do not, in and of themselves, defeat Plaintiff's age, sex, and national origin discrimination claims, and Defendant points to no authority supporting such a contention. Viewing the evidence in a light most favorable to Plaintiff, she has provided sufficient facts from which a jury could conclude that she had been the victim of sex, age, and national origin discrimination relating to Defendant's failing to approve her to act up. *Outley v. City of Chi.*, 354 F. Supp. 3d 847, 866–67 (N.D. Ill. 2019) ("[S]tray remarks in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus. . . . unless they were [made] by the decision maker and can be connected to the decision.") (internal quotation marks and citation omitted).[7]

With respect to her retaliation claim, Plaintiff must "'produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) [defendants] took a materially adverse action against her; and (3) there existed a but-for causal connection between the two.'" *Allen-Noll v. Madison Area Tech. Coll.*, No. 18-CV-216-SLC, 2019 WL 3412589, at *10 (W.D. Wis. July 29, 2019) (citations omitted). "In the retaliation context, conduct is 'materially adverse' if it would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) (citation omitted). Plaintiff filed her charges with the IDHR in February and March 2017 and March 2018. Defendant cannot have retaliated based on actions that occurred prior to the statutorily-protected activity. Thus, the only allegations relevant to the retaliation inquiry are the failure to allow Plaintiff to act up, the failure to post the November 2017 FE V vacancy, and, to the extent it is an adverse employment action, the failure to train.

Plaintiff argues that even assuming arguendo that "Defendant" did not have knowledge of her IDHR charges, she has surpassed the hurdle for summary judgment with respect to retaliation because Babapour did not have any issues with Plaintiff's performance until February

---

[7] The parties do not expressly discuss whether Babapour, Plaintiff's supervisor, and Stark, the then-Managing Deputy Commissioner, had any influence in Salinas's decision not to allow Plaintiff to act up. At this stage, the Court construes the facts in a light most favorable to Plaintiff, and assumes Babapour, as Plaintiff's supervisor, did. Whether or not Stark had any input is immaterial because his alleged discriminatory comment relates to age, and Plaintiff has already met her burden to survive summary judgment as to the age discrimination claim based on Salinas's comment regarding her age.

8

2018, when he described in a memorandum Plaintiff's alleged performance deficiencies from December 2017 through February 2018. In other words, Plaintiff's entire argument regarding retaliation is suspicious timing, which is rarely sufficient in and of itself to demonstrate retaliation. *Phillipson v. McAleenan*, No. 14 C 08138, 2019 WL 4749909, at *10 (N.D. Ill. Sept. 30, 2019) ("[T]he Seventh Circuit has consistently held that suspicious timing is rarely sufficient in isolation to support a case of retaliation.") Here, the timing does not raise a suspicion of retaliation because Babapour, to the extent he was a decisionmaker or had any influence on the decisionmaker, did not draft the memorandum detailing Plaintiff's purported deficiencies until February 2018, almost a year after Plaintiff filed her first two IDHR charges. *See Njie v. Dorethy*, 766 F. App'x 387, 392-93 (7th Cir. 2019) ("Suspicious timing is some evidence of retaliatory motive, but it is rarely sufficient, and, here, the smallest gap of five months between [the plaintiff's] protected activity and an adverse action is not close enough to carry the day.") (internal citations omitted). The Court therefore grants summary judgment to Defendant with respect to the retaliation claim.[8]

As to being disciplined for being a "no show" at work on November 2, 2016, Plaintiff contends that she did call in to report her absence despite having been told that she did not need to call in. According to Plaintiff, several of her coworkers would report anticipated absences after hours, in violation of the attendance policy, or failed to call in at all. She argues that while she was docked pay for the day she was absent, "Defendant has not indicated that any of these [other] employees [who did not follow procedure or failed to show up to work] were disciplined for violating the time and attendance policy." (Pl.'s Reply, Dkt. # 52-10, at 10.) However, while naming other employees who were supposedly not docked pay for failing to report absences, she

---

[8] In her response, Plaintiff does not address the purported retaliation based on pulling her out of training on February 28, 2018, the failure to allow her to act up starting in April 2018, and the failure to post the November 2017 FE V vacancy. Thus, she has waived her retaliation claim based on this conduct. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). In any event, the retaliation claim based on these acts does not survive summary judgment; to the extent Plaintiff seeks to rely on suspicious timing, none of the alleged retaliatory acts are close enough to her filing of the IDHR charges to raise an inference of retaliation. Moreover, Plaintiff does not set forth any evidence refuting Defendant's assertion that Salinas, as the decisionmaker for the failure to train and the denial of allowing Plaintiff to act up, did not know of the IDHR charges until Plaintiff filed her complaint on July 2, 2018, after the alleged retaliatory acts occurred. Finally, the Court notes that Plaintiff's assertion that Defendant retaliated against her by assigning her to cover the storeroom and not permitting her to cover the Instrumentation Section is not only waived, but these actions do not constitute materially adverse actions. *See Williams v. Bd. of Ed. of City of Chi.*, No. 16 C 11467, 2019 WL 4645447, at *12 (N.D. Ill. Sept. 24, 2019) ("Because Title VII does not set forth a general civility code for the American workplace, its anti-retaliation provision does not protect against petty slights, minor annoyances, and bad manners. An employee must suffer something more disruptive than a mere inconvenience or an alteration of job responsibilities.") (internal quotation marks and citations omitted).

does nothing to establish that they were similarly situated; thus, the *McDonnell-Douglas* framework is not satisfied. Nor does Plaintiff point to any other evidence that the allegedly different treatment was related to her age, sex, or national origin. For these reasons, this claim fails.

Finally, while describing in detail the circumstances surrounding her lack of promotions, Plaintiff fails to discuss any evidence supporting a discriminatory motive relating to Defendant's failing to promote her. Simply because she believes she was more qualified than the individuals who were chosen is not sufficient to imply discriminatory motive. *See Hall v. Forest River, Inc.*, 536 F.3d 615, 620 (7th Cir. 2008) ("[A]n employee's own subjective belief that she is as qualified or more qualified than another applicant is insufficient. . . .We have repeatedly stated . . . that plaintiffs must offer more than mere self-serving appraisals.") (internal quotation marks and citations omitted). Nor does Plaintiff establish that any other individuals outside her protected classes were similarly situated. Accordingly, this claim fails.

**Conclusion**

For the reasons stated above, Defendant's motion for summary judgment is granted in part and denied in part.

Date: October 10, 2019

**Ronald A. Guzmán**
**United States District Judge**